UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THOMAS C. SHERIDAN, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-1969 |
| | § | |
| ARTHUR J. GALLAGHER & CO., | § | |
| | § | |
| Defendant. | § | |

# MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

The plaintiff, Thomas C. Sheridan, brought this lawsuit against his former employer, Arthur J. Gallagher & Co. ("AJG"), claiming that his termination violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. 2601 *et seq.* Pending before the Court is the defendant's motion for summary judgment (Doc. Entry No. 65). Having reviewed the parties' submissions, the record, the undisputed facts and the applicable law, the Court determines that the defendant's motion should be GRANTED.

## II. FACTUAL BACKGROUND, PROCEDURAL HISTORY AND CONTENTIONS OF THE PARTIES

Sheridan, an insurance broker, began working for AJG in 2004, when the firm acquired his family's brokerage practice located in Friendswood, Texas. In 2011, while employed as a Senior Vice President, Sheridan sought professional help for alcohol dependence, a condition he had developed after years of heavy alcohol consumption. In January of that year, he took a leave of absence for four weeks to attend an in-patient rehabilitation program. After completing the program, Sheridan returned to work until April 2011, when he suffered a relapse. He returned to rehab for several weeks, but it is not clear whether he was treated on an in-patient basis. Sheridan claims to have performed work-related duties for AJG during this stay, including participating in conference

calls.  Finally, in July 2011 and at the urging of Tim Sheridan, his brother and an executive at AJG, Sheridan checked into an in-patient program for a four-week period.  During treatment, he reported that he had begun drinking again after receiving divorce papers from his wife.  He further reported that he "has had a great deal of difficulty with job attendance and productivity" but thought his job was not in jeopardy "because he works for a business that his family used to own."  Sheridan collected his full salary and benefits during each treatment-related absence from work.

Upon discharge from rehab, Sheridan met with his brother and Michael Henthorn, AJG's Regional President, on August 2, 2011 to discuss performance expectations moving forward.  The terms were memorialized in a Mutual Contract of Understanding ("MCU") and presented to Sheridan at the meeting.  In consideration of his continued employment, Sheridan agreed to perform his regular duties, refrain from incurring unexcused absences for the remainder of that year, and comply with the company's general policies and procedures.  Among other things, AJG's drug and alcohol policy prohibits the "[l]awful consumption of alcohol during non-work hours, off Company premises . . . if such consumption leads to impairment or influence that adversely affects the employee's work performance, the safety of any individual or property, or puts the reputation of the Company at risk."  Not only did the MCU require Sheridan to adhere to workplace guidelines, it specifically required Sheridan to refrain from drinking alcoholic beverages of any kind during work and non-work hours, attend treatment-related meetings, and follow the recommendations of his program counselors.  The MCU placed Sheridan on notice that if he violated or was suspected of violating any of its terms, he would be terminated for cause immediately.

Sheridan remained employed at AJG for the next nine months.  During that time, however, he lost customer accounts and was unable to maintain the book of business he had built.  Although he was not demoted from his position, salary adjustments appear to have been made to compensate for his waning performance.  AJG apparently did not consider him in breach of the MCU during this period.

In May 2012, however, Sheridan committed a series of acts that purportedly violated the MCU. He incurred two unexcused absences when he failed to report to work on May 7 and 8 and missed a client meeting as a result. After drinking the evening of May 8 into the early morning hours of May 9, Sheridan showed up to work several hours later in a noticeably intoxicated state. He "vaguely" remembers that a colleague offered him a ride home at that time. Sheridan left the office before receiving the ride, however, causing him to miss a work luncheon where he was expected to deliver a speech. He referred himself to detoxification late in the evening on May 9, reported to his counselors that he had consumed alcohol for 23 of the previous 30 days, and received medication for alcohol withdrawal.

On Thursday, May 10, Sheridan communicated with various colleagues concerning his whereabouts and work schedule for the remainder of the week. He informed one colleague that he would attend a client meeting scheduled the next day; told another colleague that he was home; and asked a third employee to "put me down for a vacation day." On May 11, Henthorn learned that Sheridan had incurred multiple unexcused absences that week, he had consumed alcohol and appeared in the office in an intoxicated condition, and he had conducted himself in a discourteous and unprofessional manner in the office. He determined that Sheridan's actions breached the MCU, made the decision to terminate him, and asked Human Resources executive Jennifer Duncan to prepare a talking points memorandum outlining the reasons for termination.

Duncan prepared a draft of the talking points and emailed it to Henthorn on Monday, May 14. The same day, Henthorn received a message from Sheridan requesting an opportunity to discuss his employment. Sheridan alleges that he "honestly informed [Henthorn] of the situation" before meeting Henthorn in person on May 16. At the meeting, which Sheridan describes as being "completely cordial," Henthorn informed Sheridan that he was being terminated, effective immediately; he would receive a final paycheck for wages earned through that day along with any

accrued, unused vacation; and he would receive information concerning AJG's post-termination benefits.

The parties dispute whether Sheridan requested FMLA leave during this conversation or any subsequent communication between Sheridan and AJG. Sheridan alleges that he requested the leave during the May 16 meeting and that Henthorn promptly denied it. Henthorn claims that Sheridan made no such demand and altogether failed to request medical leave of any kind. Regardless of whether the request was made, Sheridan denies that the decision to terminate him had "anything to do with [his] Family Medical Leave." In his view, "it [the termination decision] had to do with money."

On July 5, 2013, Sheridan filed the instant lawsuit alleging that his termination violated the FMLA's interference and retaliation provisions. He alleges that the defendant interfered with his FMLA rights by requiring him to accept the terms of an employment contract—the 2011 MCU—that was prepared in response to treatment-related absences that year. He further alleges that he was unlawfully terminated in retaliation for missing work while receiving treatment in May 2012. On February 21, 2014, Sheridan moved for summary adjudication of his interference claim, contending, for the first time, that AJG interfered with the FMLA rights he attempted to exercise *in 2012* (Doc. Entry No. 15). The Court denied the motion (Doc. Entry No. 54).

AJG now moves for summary judgment contending that the undisputed facts demonstrate that the plaintiff cannot establish a prima facie case for interference or retaliation under the FMLA. In response to the motion, Sheridan refers the Court to his earlier summary judgment briefing.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party that fails to make a sufficient showing of an element essential to that party's case and on which that party bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant bears the initial burden

of "informing [the Court] of the basis for its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323; *see Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **FED. R. CIV.** P. 56(c).

If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075). "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'" *Stults*, 76 F.3d at 656 (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994)). The nonmovant may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

"A fact is material only if its resolution would affect the outcome of the action . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted). When determining whether the nonmovant has established a genuine issue of material fact, a reviewing court must construe "all facts and inferences . . . in the light most favorable to the [nonmovant]." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing

*Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.* (citing *Little*, 37 F.3d at 1075 (emphasis omitted)). Nonetheless, a reviewing court may not "weigh the evidence or evaluate the credibility of witnesses." *Id.* (citing *Morris*, 144 F.3d at 380). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## IV.     ANALYSIS AND DISCUSSION

The Court grants the defendant's summary judgment motion in its entirety. Under the FMLA, a covered employer must allow an eligible employee up to 12 weeks of medical leave if the employee suffers from "a serious health condition that makes [him] unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D). Upon returning from FMLA leave, the employee is entitled to return to his previous position, or to an equivalent position. *Id.* § 2614(a)(1). The statute prohibits an employer from interfering with, restraining, or denying the exercise or attempted exercise of an employee's right to take FMLA leave. *Id.* § 2615(a)(1). Additionally, it makes it unlawful for an employer to discharge or otherwise discriminate against any individual for opposing the employer's unlawful FMLA practices. *Id.* § 2615(a)(2).

### A.     FMLA Interference Claim

To establish a prima facie case for interference, a plaintiff must show that "(1) [he] was an eligible employee, (2) [the defendant] was an employer subject to the FMLA's requirements, (3) [he] was entitled to leave, (4) [he] gave proper notice of [his] intention to take FMLA leave, and (5) [the defendant] denied [him] the benefits to which [he] was entitled under the FMLA." *Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013) (citing *Donald v. Sybra, Inc.*, 667 F.3d

757, 761 (6th Cir. 2012)). Because Sheridan cannot establish the fifth element—that AJG denied him the benefits he was entitled to receive under the statute—his interference claim fails as a matter of law.

Preliminarily, the Court notes that while, for purposes of summary judgment, Sheridan contends that AJG interfered with FMLA rights he attempted to exercise in May 2012, the theory of interference alleged in his amended complaint turns on AJG's response to treatment-related absences he incurred in 2011. The Court declines to consider Sheridan's new factual theory because it has not properly been presented to the Court. *See Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 113 (5th Cir. 2005); *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990). In any event, the theory better supports a claim of retaliation and has been advanced by the plaintiff as the factual predicate for that claim.

On the theory of interference set forth in the amended complaint, there is no dispute that AJG paid Sheridan his usual salary and benefits during the intermittent weeks that he was absent from work, due to rehab, in 2011. Moreover, there is no allegation that in 2011, AJG ever challenged the time he took for rehab, or that the company failed to reinstate him, demoted him, or failed to pay his salary after he returned from treatment. On the contrary, the record shows that AJG supported Sheridan through treatment and continued to employ him as a Senior Vice President after every absence that year. Sheridan himself admits that he continued to work at AJG after returning from each period of rehab and maintains that he was "the top insurance broker in the office" when he relapsed in May 2012. The complaint he lodges against AJG for interference simply cannot be sustained under these facts.

B. **FMLA Retaliation Claim**

The plaintiff's retaliation claim also fails as a matter of law. To establish a prima facie case, Sheridan must show that:

> (1) [he] was protected under the FMLA; (2) [he] suffered an adverse employment decision; and either (3a) that [he] was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because [he] took FMLA leave. If [Sheridan] succeeds in making a prima facie case, the burden shifts to [AJG] to articulate a legitimate nondiscriminatory or nonretaliatory reason for the employment action. Once [AJG] has done so, [Sheridan] must show by a preponderance of the evidence that [AJG's] reason is a pretext for retaliation.

*Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001) (internal citation and emphasis omitted).

Although Sheridan claims that AJG unlawfully retaliated against him, his deposition testimony undermines this assertion. Sheridan was asked whether he believed that the decision to terminate him had "anything to do with [his] Family Medical Leave." Not only did Sheridan respond with an unequivocal "no," in what appears to be an eager attempt to expose AJG's business priorities, he stated that it was his belief that "it [the termination decision] had to do with money." This admission negates any claim that could be made that AJG treated Sheridan less favorably than another employee who had not requested FMLA leave, or that the decision to terminate him was made because he took leave.

Even if Sheridan met his initial burden of proof, AJG has come forward with legitimate non-discriminatory and non-retaliatory reasons for termination: Sheridan incurred unauthorized absences, consumed alcohol in violation of company policy, and exhibited unprofessional and discourteous conduct while in the office. Internal company emails, affidavits from senior AJG employees, and intake documentation from Sheridan's May 2012 rehab stay all support this finding. Sheridan has not come forward with any summary judgment evidence to refute these documents or to show that the proffered reasons for termination were pretextual. Because evidence is lacking to establish a case for retaliation, the Court must enter summary judgment for the defendant.

## V. CONCLUSION

Based on the foregoing analysis and discussion, the defendant's motion for summary judgment is GRANTED in its entirety.

It is so **ORDERED**.

SIGNED on this 11th day of December, 2014.

_____
Kenneth M. Hoyt
United States District Judge